LITTLE ROCK GRAIN EXCHANGE v. THOMPSON, Former Collector of Internal Revenue.

No. 1961.

United States District Court E. D. Arkansas, W. D.

June 9, 1950.

E. Chas. Eichenbaum and Leonard L. Scott, Little Rock, Ark., for plaintiff.

James T. Gooch, U. S. Atty., G. D. Walker, Asst. U. S. Atty., Little Rock, Ark., Theron Lamar Caudle, Asst. Atty. Gen., Andrew D. Sharpe, Lester L. Gibson, Sp. Assts. to the Atty. Gen., on the brief, for defendant.

TRIMBLE, District Judge.

This cause came on for trial and the Court having heard the testimony and evi-

572

dence presented and having considered the stipulations of the parties, finds the facts and states its conclusions of law as follows:

### Findings of Fact

(1) Little Rock Grain Exchange located at Little Rock, Arkansas is a corporation duly organized and existing pursuant to the laws of the State of Arkansas, particularly Sections 64-1301 through 64-1312 of the Arkansas Statutes Annotated 1947, relating to benevolent or non-profit corporations.

(2) An assessment having been made by the Collector of Internal Revenue for the District of Arkansas, plaintiff paid to the defendant, Horace E. Thompson, on February 24, 1948, the following amounts of Federal Income Tax, interest and penalty for the years indicated:

| 1939 | $188.28 | |
|------|---------|--|
| 1940 | 207.94 | |
| 1941 | 244.28 | |
| 1942 | 262.46 | |
| 1943 | 1,232.28 | |
| 1944 | 453.11 | |
| 1945 | 330.68 | |
| | $2,919.03 | $2,919.03 |

On March 12, 1948, the following payments were made:

| 1946 | 87.15 | |
|------|-------|--|
| 1947 | 72.93 | |
| | 160.08 | 160.08 |
| Total | | $3,079.11 |

At the time of said payments, the defendant was Collector of Internal Revenue for the District of Arkansas, but was no longer Collector of Internal Revenue at the time of the filing of this suit.

(3) On March 24, 1948, plaintiff duly filed, duly executed and verified claims for refund for the years 1939-47, inclusive, through the Collector of Internal Revenue for the District of Arkansas, and on February 8, 1949, duly filed amended and duly executed and verified claims for refund for these years. The claims for refund and amended claims were either disallowed or were not allowed or disallowed or otherwise not acted upon by the Commissioner of Internal Revenue within six months after they were filed, and were still not acted upon when this suit was filed. This suit was filed on the 15th day of August, 1949.

(4) At the time this action was begun, the defendant, Horace E. Thompson, was a resident of the City of Monticello, County of Drew, State of Arkansas, within the jurisdiction of this Court.

(5) Jury trial was duly waived by the parties at pre-trial conference.

(6) Little Rock Grain Exchange, sometimes hereinafter referred to as "The Exchange" was incorporated on February 4, 1916. It has no capital and no capital stock, there being direct and associate members only. Direct members consist of feed manufacturers and corn millers and during the years in question consisted of six (6) direct members, all of whom received and shipped grain and allied products in intrastate and interstate commerce. Associate members, during the years in question, consisted of two or three grain products brokers. Since inception there has been some slight change in the number of members, direct and associate, there having been as many as eighteen (18) members in earlier years.

(7) The preamble to the constitution provides: "We, the undersigned, being engaged in the buying and selling of hay, grain, grain products, and cotton seed products, and recognizing the necessity of a Grain Exchange, do hereby associate ourselves into an organization, the object of which shall be the advancement and protection of the common interests of those engaged in the hay and grain business, the formulation of rules for the transaction of business, and the promotion of friendly relations among the hay and grain men; for the furtherance of our purpose and we hereby create and establish this constitution."

(8) Since its inception, the Exchange has been operated in accordance with those purposes.

(9) None of the Officers of the Exchange have ever received salaries other than a nominal monthly salary received by the Secretary prior to 1932.

(10) The Exchange grew out of the grain committee of the Little Rock Board

of Trade, which is now known as the Little Rock Chamber of Commerce and is itself exempt from income tax under Section 101 (7) of the Internal Revenue Code, 26 U.S. C.A. § 101(7). Early in the existence of the Exchange, the direct members were induced to become members of the Little Rock Chamber of Commerce, dues to the Chamber of Commerce being assessed by it to the Exchange as a whole and in turn pro-rated by the Exchange among its members. The primary association of the Exchange with the Chamber of Commerce is working in cooperation with the Traffic Department with reference to proposed freight rate matters affecting this territory, and as shown by the statements hereinafter referred to during the years in question. It contributed from time to time to expenses of the Traffic Manager of the Little Rock Chamber of Commerce.

(11) The Exchange has also adopted trade rules and regulations for this particular market, similar to the rules adopted by the Grain Dealers National Association. The Exchange also has arranged for distribution of market reports and information among the members. At one time the Exchange was charged for this service and the members were assessed therefor but during the years in question there was no charge made to or by the Exchange.

(12) In its early existence the Exchange advertised the Little Rock Grain Exchange in a grain dealers' journal. To some extent the Exchange has acted as an arbitrator on disputes arising between members and nonmembers. On three or four occasions it has actively attempted to influence legislation affecting the grain industry. It has conducted a few other activities beneficial to the trade as a whole.

(13) For many years in addition to annual meetings of members the Exchange has held a weekly luncheon at which matters of common interest to the trade were discussed and business of the Exchange transacted.

(14) The chief activity conducted by the Exchange and the one most beneficial to the trade is the employment, for a monthly salary of a federally licensed grain inspector to inspect and weigh carloads and truckloads of grain and allied products. This inspector is licensed under the United States Grain Standards Act, 7 U.S.C.A. § 71 et seq.

(15) Certain types of grain shipped in interstate commerce are required to be inspected by a federally licensed inspector either at point of origin, enroute, or at destination. The Act does not apply to intrastate shipments, nor does it apply to grain products such as bran and shorts and wheat mixed feeds, screenings and the like. All inspections by the Inspector are certified as to grade, moisture content, damage and the like.

(16) For members, by rule of the Exchange, the Inspector inspects not only cars of grain required to be inspected under the United States Grain Standards Act, but inspects all the other receipts of grain and grain and allied products, that is, grain required to be inspected but which had already been inspected at point of origin; grain not required to be inspected because it is an intrastate shipment and grain and allied products not required to be inspected. This is done to maintain the revenues of the Exchange, and amounts to about forty percent (40%) of the inspection fees received from members.

(17) Although from time to time the Inspector has had an assistant, all certificates of grade are made by him only. The inspector is also assisted in the Inspection Department by a part-time office girl or bookkeeper. These assistants are employed by the Exchange and are paid a salary.

(18) The Exchange has its own inspection equipment but does not own any scales or weighing equipment, this being owned by the members individually. The accuracy of the scales is maintained by the inspector. The weighing is usually done by deputy weighers who are not employed by the Exchange but by the particular millers, but the inspector of the Exchange is responsible for the weighing and settles any disputes arising. Weight certificates are issued by the Exchange.

(19) Weighing is only done on transactions pertaining to members and a small charge of approximately twenty-five cents

per car is made. It is not required under the Grain Standards Act.

(20) Since inception inspection services have also been available to non-members. Originally, these non-members' inspection fees constituted a small percentage of the total receipts of the Exchange, but during the years in question rose from about 5% in 1939 to approximately 33-⅓% in 1944, inspection fees of members and non-members being about equal in that year. This increase was due to the war and to the advent of soy beans as an important item of grain.

(21) Under the Grain Standards Act, the Inspector cannot refuse to inspect grains covered by the Act for non-members, and is required to make reasonable non-discriminatory charges.

(22) During the years in question the inspection charges were One Dollar ($1) per car for members and One Dollar and Fifty cents ($1.50) per car for non-members. This difference in charges is made because members' cars are usually inspected four or five or more at a time, while non-members usually have only one car for inspection, because the Inspector always knows where members' cars are located in the Railroad yards and always has to spend time locating the non-members' cars, sometimes as much as a whole day, because a non-member usually requires more immediate service than a member, because of the additional bookkeeping involved and also as an attempt to equalize the fact that non-members pay no dues. The Inspector is required to furnish and does furnish schedules of rates to the Department of Agriculture under the Grain Standards Act for its approval. The indicated differences in rates has been made known to the Department in these schedules.

(23) The Inspector also inspects truckloads of grain and related products. Virtually all of this is done for non-members and is usually for cash. The charge during the years in question was fifty cents (50¢) per truck.

(24) The maintenance of the Inspection Department in Little Rock is beneficial to the grain trade, is an aid to commerce and conducive to the general welfare by establishing and preserving an honest and reliable market in grain and grain products. It tends to create good will as well as stimulate business in the community.

(25) Although the Inspection Department was a part of the Exchange from its inception, originally the inspection fees were retained by the then Inspector. He was, however, unable to make ends meet from his fees, and in order to keep and maintain the Inspection services, the Grain Exchange began paying the Inspector a fixed salary in 1920 and has done so since that time. The Little Rock grain market is not and has not been large enough to sustain an independent inspector relying on his fees alone for a livelihood. The present Inspector has been with the Exchange since January 1, 1921. He preferred to be on a salary basis, assured of an income by an organized Exchange rather than operate as an independent, and has been hired by the Exchange to keep him here. He has always been paid on a flat salary basis, varying from a low of $175.00 to a high of $275 per month, with two or three bonuses of $300.00 throughout the years.

(26) In order to maintain the revenues of the Exchange and keep a federally licensed inspector in Little Rock, particularly in loss or lean years, from time to time dues have been raised, assessments made, fees raised and members have been required to have all their incoming cars inspected even though not required to be inspected under the Grain Standards Act.

(27) All moneys collected by the Exchange are used or held for use in furtherance of its purpose and no part of same has ever been distributed to any member.

(28) There were approximately 150 Federal Grain inspection points under the United States Grain Standards Act in 1947, about 30 of which were operated by independent inspectors, the remainder of the inspectors operating under a Grain Exchange, Chamber of Commerce, Board of Trade or State Agency. In prior years, generally the inspection points and number of independent inspectors was about the same. These inspection points are scattered throughout the United States and in no instance is there an independent inspector

or group of independent inspectors at the same inspection point with an inspector or group of inspectors of another organization, and in only two instances is there an inspector or group of inspectors of different organizations (Los Angeles Grain Exchange and State of California; San Francisco Chamber of Commerce and the State of California). There is no other federally licensed inspector in the City of Little Rock, County of Pulaski or the State of Arkansas, except an independent inspector of soy beans in Blytheville, Arkansas, which we judicially know is about two hundred miles from Little Rock. The Little Rock Inspector is authorized to inspect wheat, barley, oats, rye, mixed grains, flax seed, corn, grain sorghum and soy beans. The Department of Agriculture would not permit an additional licensed inspector to come to Little Rock unless he was needed and then would not permit him to operate competitively.

(29) Originally there were unlicensed grain inspectors but since the passage of the Grain Standards Act in 1916, they have gradually gone out of existence.

(30) The operating statements from April 1937 through December 31, 1949, are stipulated and are so found. Since the amount of taxes was not in dispute, the periods stipulated to did not always involve yearly periods. The profits or losses for these periods are:

| Period | Profits | Losses |
| --- | --- | --- |
| April 1937–February 1939 | | $384.74 |
| February 1939–December 20, 1940 | $645.63 | |
| December 20, 1940–March 1941 | | 164.23 |
| March 26, 1941–February 11, 1942 | | 646.38 |
| February 11, 1942–April 16, 1943 | 1,088.73 | |
| 1943 | 2,157.91 | |
| 1944 | 840.41 | |
| 1945 | 628.54 | |
| 1946 | 415.00 | |
| 1947 | 361.91 | |
| 1948 | | 629.04 |
| 1949 | | 1,212.74 |

The only source of revenues during these years was inspection and weighing fees, dues, sales of samples (ranging from one hundred dollars to six hundred seventy dollars) and a nominal amount of interest from a savings account while it existed. The samples are derived from inspections.

(31) Dues have varied from time to time. During most of the years in question they totaled Seventy-Five Dollars ($75) per month for all members and associates.

(32) Prior to 1937, in some years there was a profit and in other years there has been a deficiency.

(33) When there has been a surplus it has been held as a cushion against periods of low receipts so that the facilities will not be discontinued for lack of funds to pay the Inspector and other necessary expenses and continue the activities carried on by the Exchange.

(34) The accumulated surplus or net worth of the Exchange, as of December 31, 1947, including the reserve for Federal Income Taxes which were in fact paid in 1948, was $5,629.39, excluding fixed assets represented by inspection equipment and furniture and fixtures, most of which are thirty years old and which have a value of about $1,000.

(35) The main purpose of the Exchange was the improvement of the grain industry as a whole in and around Little Rock. This is accomplished primarily by the establishment and preservation of an honest and reliable market. Such a market was established and preserved by maintaining its Inspection Department.

(36) The charges for inspection and weighing services and sales of samples were incidental to the Exchange's main purposes and all benefits to members merely incidental thereto.

(37) The Little Rock Grain Exchange is a business league. It was not organized for profit and has never been conducted for the purpose of profit. No part of its earnings or assets has ever been distributed to its members, direct or associate.

### Conclusions of Law

(1) The Court is of the opinion that this case is ruled by the case of Crooks,

Collector **v.** Kansas City Hay Dealers' Association, 8 Cir., 37 F.2d 83.

(2) Plaintiff, Little Rock Grain Exchange, is and has been since inception, within the meaning of Section 101(7), Internal Revenue Code, and regulations pertaining thereto, a business league, not organized or conducted for profit, no part of the earnings of which inures to the benefit of any private shareholder or individual.

(3) Plaintiff, Little Rock Grain Exchange, is entitled to judgment on all counts for income tax, penalties and interest in the total amount of $3,079.11, with interest at six percent (6%) per annum on $2,919.03 thereof from February 24, 1948 and with interest at six percent (6%) per annum on $160.08 thereof from March 12, 1948.